IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| GS HOLISTIC, LLC, | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | Civil Action No. 4:23-cv-00414-O |
| | § | |
| HAZ INVESTMENTS, LLC d/b/a | § | |
| HAZ SMOKE & VAPE, *et. al.*, | § | |
| | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court is the Motion for Default Final Judgment Against Both Defendants that GS Holistic, LLC ("GS") filed against Haz Investments, LLC d/b/a Haz Smoke & Vape ("Haz") and Hazim Assaf (collectively, "Defendants") on September 11, 2023. ECF No. 13. By Order dated September 11, 2023, United States District Judge Reed O'Connor referred the Motion to the undersigned for hearing, if necessary, and final determination under 28 U.S.C. § 636(b). ECF No. 14. The undersigned ordered additional briefing on November 3, 2023 (ECF No. 15), and GS filed the briefing on November 22, 2023 (ECF No. 18). Having considered the Motion, briefing, appendices, and applicable legal authorities, the undersigned **RECOMMENDS** that Judge O'Connor **GRANT** Plaintiff's Motion for Default Final Judgment Against Both Defendants (ECF No. 13) in **PART** and award $15,000 in statutory damages, $782.00 in costs, and injunctive relief.

## I.    BACKGROUND

This case involves allegations of "trademark infringement, counterfeiting, and false designation of origin and unfair competition" under the Lanham Act (15 U.S.C. § 1051 *et. seq.*); ECF No. 1 at 1. GS holds a variety of trademarks relating to its widely known, high-end vaping products. ECF No. 1 at 2-5. "Since 2020, GS has worked to build significant goodwill in the

Stündenglass brand in the United States." *Id*. at 4. However, counterfeiters and those who seek to resell counterfeit products have sought to profit from GS's success with the G Pen brand, sparking this litigation. *Id*. at 5. "[A] Stündenglass brand glass infuser is priced at $599.95, while a non-Stündenglass branded product is also being sold for up to $600, with a range of $199 to $600." *Id*. "It is exactly because of their higher sales value that Stündenglass branded products are targeted by counterfeiters." *Id*.

GS accuses Defendants of selling "counterfeit Stündenglass products with the Stündenglass trademark and without the consent of GS." *Id*. Specifically, GS claims that its investigator visited Haz's establishment and "observed that it had an excess of vaporizers which displayed the Stündenglass Trademarks." *Id*. at 6. "The investigator purchased a Glass Infuser with a Stündenglass Mark affixed to it, from [Haz], for a cost of $541.24 … and it was a Counterfeit product in that it displayed the Infringing Marks." *Id*. at 6-7. GS alleges that Defendants "cause confusion and deception in the marketplace" as well as other ills. *Id*. at 8.

GS sued Defendants, asserting two central counts: 1) trademark counterfeiting and infringement under 15 U.S.C. § 1114 and 2) false designation of origin and unfair competition under 15 U.S.C. § 1125(a). *Id*. at 10-12. In the pending Motion, GS also references trademark counterfeiting under 15 U.S.C. § 1116(d). ECF No. 13 at 2.

Defendants have failed to participate in this lawsuit. On April 27, 2023, the clerk issued a summons for each Defendant, and on June 12, 2023, both summonses were returned executed. ECF Nos. 7-9. On August 28, 2023, GS requested that the Clerk enter default against Defendants, since Defendants were "to have responded to or filed an answer to the Complaint by June 6, 2023, but failed to file anything with this Court." ECF No. 11 at 1, 2. On August 28, 2023, the clerk entered default as to the Defendants. ECF No. 12. On September 11, 2023, GS moved for default

judgment against all defendants (ECF No. 13), and Judge O'Connor referred the motion to the undersigned (ECF No. 14). On November 3, 2023, the undersigned ordered GS to provide additional briefing. ECF No. 15. Following an extension (ECF No. 17), GS filed the additional briefing on November 22, 2023 (ECF No. 18). GS's Motion (ECF No. 13) is now ripe for review.

## II.    LEGAL STANDARDS

### A.    Default Judgment.

Federal Rule of Civil Procedure 55 governs the entry of default and default judgment. There are three stages to entry of default judgment. First, a default occurs "when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules." *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996); *see also* Fed. R. Civ. P. 55(a) (noting default occurs where the defendant "has failed to plead or otherwise defend" against the complaint). Second, the Clerk may enter a defendant's default if it is "established by affidavit or otherwise." *Brown*, 84 F.3d at 141 (citing Fed. R. Civ. P. 55(a)). Third, if the Clerk enters default and the plaintiff's claim is not "for a sum certain or a sum that can be made certain by computation," the plaintiff must apply for a default judgment from the Court. Fed. R. Civ. P. 55(b)(1-2). However, the Court may not enter default judgment against an individual in military service until an attorney is appointed to represent the defendant. 50 U.S.C. § 521.

"[A] party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default." *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001). Rather, courts retain ultimate discretion to grant or deny default judgments. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

Courts use a three-pronged analysis to determine if default judgment is appropriate. *J & J Sports Prods., Inc. v. Morelia Mex. Rest., Inc.*, 126 F. Supp. 3d 809, 813 (N.D. Tex. 2015). First,

courts ask if default judgment is procedurally warranted. *See Lindsey*, 161 F.3d at 893. Under *Lindsey*, the Court may consider whether: (1) material issues of fact exist; (2) there has been substantial prejudice; (3) the grounds for default are clearly established; (4) the default was caused by a good faith mistake or excusable neglect; (5) default judgment would be too harsh; and (6) the court would be obliged to set aside the default upon motion from the defendant. *Id.*

Second, if default is procedurally warranted under *Lindsey*, courts analyze the substantive merits of the plaintiff's claims and ask if the pleadings establish a sufficient basis for default judgment. *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). The pleadings are sufficient if they satisfy Federal Rule of Civil Procedure 8. *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 498 (5th Cir. 2015); *see* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). "The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." *Nishimatsu*, 515 F.2d at 1206. But the "defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Id.*

Third, courts determine what form of relief, if any, the plaintiff should receive. *Morelia*, 126 F. Supp. 3d at 813. In making this determination, the Complaint's "well-pleaded factual allegations are taken as true, except regarding damages." *U.S. for Use of M-Co Constr.*, *Inc. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987); *see generally Jackson v. FIE Corp.*, 302 F.3d 515, 525 & n.29 (5th Cir. 2002) ("If the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.") (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE & PROCEDURE § 2688 at 58-59 & n.5 (3d ed. 1998)). At this juncture, courts often find

it helpful to conduct a Rule 55(b)(2) hearing. *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979) ("The case law is clear that a judgment by default may not be entered without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation."); *see* Fed. R. Civ. P. 55(b)(2) (noting courts may conduct a hearing on motions for default judgment if needed to "(A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter").

While the Fifth Circuit has "adopted a policy in favor of resolving cases on their merits and against the use of default judgments," this policy is "counterbalanced by considerations of social goals, justice and expediency, a weighing process . . . largely within the domain of the trial judge's discretion." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 594 (5th Cir. 2014) (quoting *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 936 (5th Cir. 1999)). But default judgment remains "a drastic remedy, not favored by the Federal Rules." *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989); *see also Shipco*, 814 F.2d at 1014 (calling default judgments "draconian").

## III.    ANALYSIS

### A.    Default judgment is procedurally warranted under *Lindsey.*

Under *Lindsey*, default judgment may be procedurally warranted based on six considerations. *See* 161 F.3d at 893. Each of the six supports default judgment for GS's claims under 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), and 15 U.S.C. § 1116(d).

For the first factor, no material issues of fact remain for GS's claims. GS's pleadings state particular facts to show trademark infringement and unfair competition under 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a). As explained more fully below, the trademarks at issue are legally protectable and GS has demonstrated a likelihood of confusion, *Rex Real Estate I, L.P., v. Rex*

*Real Estate Exch., Inc.*, 80 F.4th 607, 616 (5th Cir. 2023); and the intent and knowledge requirements are met, allowing the Court to find in GS's favor on trademark counterfeiting. *Chanel Inc., v. Christian Salvator NY Corp.*, No. 3:22-cv-2218-K, 2023 WL 8242743 at *9 (N.D. Tex. Nov. 3, 2023) (internal citations and quotations omitted). Furthermore, since Defendants have not participated in this suit, they have not disputed any material facts in the suit.

For the second factor, nothing here shows that the "substantial prejudice" requirement would undermine GS's entitlement to default judgment. *See Lindsey*, 161 F.3d at 893. If anything, this requirement strengthens GS's entitlement to default judgment, because GS may be prejudiced by Defendants' non-participation. *See United States v. Petra Corp.*, No. 3:22-CV-0930-B, 2023 WL 4374432, at *3 (N.D. Tex. July 6, 2023) (noting that the defendants' "failure to respond threatens to bring the adversary process to a halt, effectively prejudicing the [participating party's] interests."); *see also* ECF No. 13 at 6-7 ("[I]f default judgment is not granted, the Plaintiff will be left with no recourse for its injuries to its reputation and business caused by the Defendants' illegal counterfeiting activities. Such an outcome would be unfairly prejudicial to the Plaintiff.").

The third and fourth factors also support default judgment because the grounds of Defendants' default are clearly established, *see* ECF Nos. 10-13, and nothing shows that the default was due to "a good faith mistake or excusable neglect." *See Lindsey*, 161 F.3d at 893.

As for the fifth factor, to date Defendants have failed to file any pleadings with the Court, despite being afforded abundant opportunities to do so. It has been over nine months since GS filed its complaint, and Defendants have filed nothing. Accordingly, the fifth factor supports default judgment, as a judgment by default is not too harsh when the defaulting party has had every opportunity to plead its cause, but did not do so. *See id.*

Finally, given the satisfaction of the above elements, nothing indicates that the Court would "be obliged to set aside the default upon motion from the defendant." *See id.*; *see also Moreno v. LG Elecs.*, 800 F.3d 692, 698 (5th Cir. 2015) (noting district courts are not obliged to set aside a default upon defendant's motion where "the default was willful, the plaintiff will be prejudiced, or the defendant has no meritorious defense").

With each of the six *Lindsey* factors supporting default judgment on GS's claims, they survive the step-one analysis. *See Morelia*, 126 F. Supp. 3d at 813-14. At step two, the Court must examine the substantive merits of GS's claims and determine whether the pleadings establish a sufficient basis for default judgment on each. *See Nishimatsu*, 515 F.2d at 1206.

### B.    On the merits, GS's pleadings satisfy Rule 8.

A plaintiff's pleadings typically establish entitlement to default judgment if they satisfy Federal Rule of Civil Procedure 8. *Wooten*, 788 F.3d at 498. To do so, the pleadings need only contain "a short and plain statement of the claim" showing the plaintiff's entitlement to relief. Fed. R. Civ. P. 8(a). Factual allegations need only "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Wooten*, 788 F.3d at 497 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "This low threshold is less rigorous than that under Rule 12(b)(6)." *Liberty Burger Prop. Co. v. Liberty Rebellion Rest. Group, LLC*, No. 3:22-CV-00085-E, 2023 WL 349790 at *4 (N.D. Tex. Jan. 20, 2023) (internal citations and quotations omitted) (citing *Wooten*, 788 F.3d at 498).

GS pleads trademark infringement, unfair competition, false designation of origin, and trademark counterfeiting causes of action under the Lanham Act. To prevail on a claim for trademark infringement under 15 U.S.C. § 1114, "Plaintiff must show (1) it possesses a legally

protectable trademark and (2) Defendant's use of this trademark creates a likelihood of confusion as to source, affiliation, or sponsorship." *Rex Real Estate I,* 80 F.4th at 616. "[T]he Court's likelihood of confusion analysis below for Plaintiff's federal trademark infringement claim applies also to Plaintiff's federal claims for unfair competition." *Firebirds Int'l, LLC v. Firebird Rest. Group, LLC*, 397 F. Supp. 3d 847, 859 (N.D. Tex. 2019); *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483 (5th Cir. 2004); *Matrix Essentials, Inc. v. Emporium Drug Mart*, 988 F.2d 587, 592 (5th Cir. 1993) ("As with trademark infringement, the touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion.'").

Likewise, "[t]he elements of a claim for false designation of origin parallel those of a claim for trademark infringement, and the same evidence establishes both claims." *Choice Hotels Int'l, Inc. v. Cheema Invs.*, *LLC*, No. 3:11-CV-01762-O, LLC, 2023 WL 12125998 at *4 (N.D. Tex. Feb. 20, 2013) (O'Connor, J.). Somewhat similarly, "[t]o state a claim for trademark counterfeiting, a plaintiff must allege that (1) defendants infringed a registered trademark in violation of 15 U.S.C. § 1114(1)(a), and (2) intentionally used the trademark knowing it was counterfeit." *Chanel Inc.,* 2023 WL 8242743 at *9 (internal citations and quotations omitted).

### 1.    GS possesses legally protectable trademarks.

To show that a plaintiff possesses a legally protectable trademark under the Lanham Act, the mark must be distinctive. *Two Pesos*, *Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992). For product design, a showing of secondary meaning is required in order to be distinctive and thus protectable. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000).

"Marks are classified along a spectrum in order of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Rex Real Estate I*, 80 F.4th at 618.

This classification is "known as the *Abercrombie* test, after Judge Friendly's opinion" in a case involving the clothing company, Abercrombie & Fitch. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 232 (5th Cir. 2010) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)). "Word marks that are suggestive, arbitrary, or fanciful are inherently distinctive." *Rex Real Estate I*, 80 F.4th at 618.

"A generic term refers to a class of which a good is a member." *Id.* "Generic terms receive no trademark protection." *Xtreme Lashes,* 576 F.3d at 227. "A descriptive term provides an attribute or quality of a good." *Rex Real Estate I*, 80 F.4th at 618. "A suggestive term suggests, but does not describe, an attribute of the good; it requires the consumer to exercise his or her imagination to apply the trademark to the good." *Id.* "Arbitrary marks are usually ordinary words which do not suggest or describe the services involved." *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.,* 982 F.3d 280, 292 (5th Cir. 2020) (internal citations and quotations omitted). Like arbitrary marks, fanciful marks "bear no relationship to the products or services to which they are applied." *Zatarain's, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790-91 (5th Cir. 1983), *abrogated on other grounds by KB Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004). "[F]anciful marks usually are made-up words" such as "Kleenex" and "Kodak." *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 641 (N.D. Tex. 2022); *see also Eastman Kodak Co. v. Weil*, 137 Misc. 506, 243 N.Y.S. 319 (1930).

The doctrine of foreign equivalents "requires courts to translate foreign words into English to test them for genericness or descriptiveness." *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 443 (5th Cir. 2000). This doctrine stems from several policy considerations, such as "international comity: because U.S. companies would be hamstrung in international trade if

foreign countries granted trademark protection to generic English words, the U.S. reciprocates and refuses trademark protection to generic foreign words." *Id*.

"The first step in the analysis is translating" the foreign word at issue. *Id*. Here, "Stündenglass" translates to "hourglass," according to GS. ECF No. 18 at 3. A picture provided by GS depicting the legitimate Stündenglass product demonstrates that it has an hourglass shape (as well as pineapple-themed design elements).



Exhibit D – Picture from the
Plaintiff's website showing glass globes

ECF No. 18 at 42. Therefore, in the absence of an exception, Stündenglass would be a descriptive mark, because Stündenglass, as translated to "hourglass," describes the appearance of the smoking device. *See Asazu LLC v. Collectandcreate LLC*, No. 3:23-CV-1285-B, 2023 WL 8244046, at *3 (N.D. Tex. Nov. 28, 2023) ("The KOMÉ mark is best classified as descriptive…The word 'KOMÉ' translates to 'uncooked rice,' which undoubtedly references a staple ingredient in Japanese cuisine including sushi."). *But see Tesoros Trading Co. v. Tesoros Misticos, Inc.* 10 F. Supp. 3d 701, 713 n.2 (N.D. Tex. 2014) ("…, 'Tesoros' ('treasure' in English) is not being used as a general mark in this context. It is not actually describing treasure, but rather, … in this case, is a suggestive mark.").

However, GS argues that an exception should apply. Specifically, GS asserts that the doctrine of foreign equivalents only applies when it is likely that an ordinary American purchaser

would translate the term into English. ECF No. 18 at 3. The Court previously has recognized this exception, writing that "Courts should employ the doctrine of foreign equivalents, however, 'only when it is likely that the ordinary American purchaser would stop and translate [the foreign word] into its English equivalent.'" *Master Saddles Inc. v. Taylor*, No. 3:20-CV-3709-B, 2021 WL 1814697, at *6 (N.D. Tex. May 6, 2021).

GS notes the relatively low percentage of the U.S. population that speaks German, as well as the sonic dissimilarity between the words "hourglass" and "Stündenglass," arguing that the ordinary American purchaser would not translate "Stündenglass" to "hourglass." ECF No. 18 at 3-4. Thus, GS asserts that the doctrine of foreign equivalents should not apply. *Id*. The Court applied similar logic to a Portuguese word, writing that "Plaintiff's cited authority does not persuade the Court that Portuguese is such a language with which an appreciable number of Americans is familiar." *Master Saddles,* No. 3:20-CV-3709-B, 2021 WL 1814697 at *6.

Courts do not appear to have explicitly addressed whether an appreciable number of Americans speak German such that the doctrine of foreign equivalents should apply, although a few courts outside the Fifth Circuit have mentioned the doctrine while discussing trademark protections for German words. *See WRB Inc. v. DAMM, LLC*, No. 21-CV-1899, 2022 WL 136914, at *7 (D. Minn. Jan. 14, 2022) (applying the doctrine to a German word and finding that "[t]he Court will not find names to be confusingly similar where the only similarity is a word in a foreign language."); *Ligntnin Chem. Co. v. Royal Home Prods.*, 39 C.C.P.A. 1031, 1033 (Cust. & Pat. App. 1952) (recognizing that "[t]he tribunals in the Patent Office held that 'lightnin' is the English translation of the German word 'Blitz'" and "that there is no distinction, in a trade-mark sense, between and English word and its foreign equivalent" but focusing on the issue of laches).

11

Moreover, the Court takes judicial notice of the U.S. Census Bureau's report, "Language Use in the United States: 2019," which states that as of 2019, a very similar number of Americans spoke German at home as spoke Portuguese at home. U.S. Dept. of Commerce, Bureau of Census, Language Use in the United States: 2019, p. 3 (2019) https://perma.cc/C3DG-G83F (reporting that 845,801 Americans spoke Portuguese or Portuguese Creole while 895,309 Americans spoke German); Fed. R. Evid. 201(b)(2). Therefore, the Court follows the logic applied to Portuguese in *Master Saddles* and finds that the doctrine of foreign equivalents does not apply to the German term, Stündenglass. Absent the use of the doctrine of foreign equivalents, Stündenglass is best understood as an arbitrary and thus protectable mark.

"When considering marks without words, like images or symbols," the Court applies a different test. *Savage Tavern*, 589 F. Supp. at 642. As opposed to the *Abercrombie* test above, "under the *Seabrook Foods* test, courts look to a set of factors in determining whether a design is arbitrary or distinctive." *Amazing Spaces*, 608 F.3d at 232 (internal citations and quotations omitted); *see also Seabrook Foods, Inc. v. Bar-Well Foods Ltd.,* 568 F.2d 1342 (Cust. & Pat. App 1978). In particular, courts consider:

> [1] whether it was a "common" basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Amazing Spaces,* 608 F.3d at 232. "These factors are not discrete inquiries but are 'variations on a theme'—namely 'whether the design, shape or combination of elements is so unique . . . that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark.'" *Savage Tavern*, 589 F. Supp. at 642 (internal citations omitted).

The *Seabrook Foods* test and the Fifth Circuit's treatment of commonplace symbols in *Amazing Spaces* shed light on how to analyze GS's use of the letter "S" in Registration No. 6,174,292 (hereinafter "the Oblong S Mark"). Citing the Restatement (Third) of Unfair Competition, the Fifth Circuit explains:

> Commonplace symbols and designs are not inherently distinctive since their appearance on numerous products makes it unlikely that consumers will view them as distinctive of the goods or services of a particular seller. Thus, unless the symbol or design is striking, unusual, or otherwise likely to differentiate the products of a particular producer, the designation is not inherently distinctive.

*Amazing Spaces, Inc.*, 608 F.3d at 241 (citing Restatement (Third) of Unfair Competition § 13 cmt. d, at 107).

The Oblong S Mark consists of the letter, "S," entwined around an oblong capsule shape:

Plaintiff's Registered Mark
No. 6,174,292. Exhibit O



GS has not briefed the extent to which the Oblong S Mark meets the elements of the *Seabrook Foods* test, but the Court notes that under the first *Seabrook Foods* factor weighs against the protectability of this mark, as the letter "S" is a common "basic shape or design." *Amazing Spaces*, 608 F.3d at 232. However, because it is uncommon to see an oblong shape depicted within the letter S, the Oblong S Mark "is striking, unusual, or otherwise likely to differentiate the products of a particular producer." *Id*. at 241. So, the Oblong S Mark is distinctive and thus

protectable. *See Varsity Spirit LLC v. Varsity Tutors, LLC*, No. 3:21-CV-0432-D, 2022 WL 1266030 at *4 (N.D. Tex. Apr. 28, 2022) (finding that a "highly-stylized 'V' logo raises a presumption of inherent distinctiveness and is sufficient for the court to conclude that Varsity has plausibly pleaded the first element of its trademark infringement claim.").

Furthermore, the Lanham Act provides that a party may protect a trademark by registering it with the United States Patent and Trademark Office ("USPTO"). 15 U.S.C. § 1051. A certificate of registration is *prima facie* evidence of a trademark's validity, registration, and ownership, and of the owner's exclusive right to use the trademark in commerce. *Id.* §§ 1057(b), 1115(a). However, "[t]his presumption of validity may be rebutted by establishing that the mark is not inherently distinctive." *Amazing Spaces, Inc.*, 608 F.3d 225 at 237.

GS successfully registered the Oblong S Mark with the USPTO. ECF No. 18-2. The defaulting Defendants have not attempted to rebut the presumption of validity. Therefore, the undersigned finds that the presumption of validity arising from the certificate of registration also supports a finding that the Oblong S Mark is protectable. Case law from other circuits indicating that letters of the alphabet can be arbitrary marks provides additional support for this result. *See, e.g., Michelin Tire Corp. v. The Gen. Tire & Rubber Co.*, 202 U.S.P.Q. 294, 298, 1979 WL 24838, at *6 (T.T.A.B. 1979) ("There is nothing…in decisional law to preclude a single letter from functioning as a trademark and, in fact, from serving as an arbitrary and strong mark."); *Team Gordon, Inc. v. Specialized Bicycle Components, Inc.*, 98 U.S.P.Q.2d 1650, 2020 WL 5058624 (C.D. Cal. 2010) ("A single letter is always arbitrary."); *but see L.F. Gaubert & Co., Inc. v. Institute of Elec. and Electronics Eng'rs, Inc*. 563 F. Supp. 122, 127 (E.D. La. 1983) (finding that letters can be descriptive in certain industry contexts, namely, "[i]n an industry that as a long-

standing practice uses single letters to describe certain cable components, 'X' is a likely choice for description of a cross-linked polyethylene insulation.").

In sum, all of GS's trademarks at issue in this suit likely are legally protectable. "Stündenglass," as used in Registered Mark Nos. 6,174,291 and 6,633,884, is an arbitrary mark because the doctrine of foreign equivalents does not apply. The Oblong S Mark, as used in Registered Mark No. 6,174,202, is "striking, unusual, or otherwise likely to differentiate the products of a particular producer." *Amazing Spaces*, 608 F.3d at 241.

### 2.    GS has demonstrated a likelihood of confusion with regard to these marks.

"To evaluate whether there is a likelihood of confusion," the Fifth Circuit uses

> a non-exhaustive list of factors known as the "digits of confusion."
> The digits are: (1) the type of trademark; (2) mark similarity; (3)
> product similarity; (4) outlet and purchaser identity; (5) advertising
> media identity; (6) defendant's intent; (7) actual confusion; and (8)
> care exercised by potential purchasers. No digit is dispositive, and
> the digits may weigh differently from case to case, depending on the
> particular facts and circumstances involved. In addition to the digits
> of confusion, the particular context in which the mark appears must
> receive special emphasis.

*Rex Real Estate I.,* 80 F.4th at 621 (internal citations and quotations omitted). Where a defendant uses an identical mark, the Court has found that although a presumption of confusion then exists and an analysis of the digits of confusion is not strictly necessary, it still is worthwhile. *Totalcare Healthcare Services, LLC v. TotalMD, LLC*, 643 F. Supp. 3d 636, 646 (N.D. Tex. 2022). Accordingly, the undersigned examines the digits of confusion.

First, the Court considers the type of trademark, which "refers to the strength of the senior mark." *Rex Real Estate I*, 80 F.4th at 621 (internal citations omitted). The Court looks at "two factors in determining the strength of a mark: (1) the mark's position along the distinctiveness spectrum, and (2) the standing of the mark in the marketplace." *Id*. (internal citations and

quotations omitted). As for the first sub-factor, as explained above, GS has presented evidence sufficient to satisfy Rule 8 that the marks are distinctive. As for the second sub-factor, courts consider factors such as "duration of use and advertising" and whether there is "extensive third-party use of a term throughout the market." *Firebirds*, 397 F. Supp. 3d at 861-62.

As for duration, GS has used the marks since 2020. ECF No. 1 at 2; *see also* registration documents at ECF Nos. 18-1, 18-2, and 18-3. Christopher Folkerts's Affidavit as to Damages ("the Folkerts Affidavit") states: "[s]ince 2020, when GS Began marketing and selling products with the Stündenglass Trademarks on them…" (ECF No. 13-2 at 1). As for advertising, GS has provided evidence of celebrity endorsements for products bearing Registered Mark No. 6,174,292. ECF No. 18 at 7-8, 40-41. To the extent that GS addresses third-party use, it states that it "is aware of no other similar marks, goods, or services that make any kind of use of its brand name within the sphere of consumers it perceives may buy its product. Therefore [GS] asserts its brand is relatively unique …" ECF No. 18 at 8. On this factor, overall, "type of trademark" weighs in GS's favor.

Second, courts consider mark similarity. "The degree of similarity between marks is determined by comparing the marks' appearance, sound, and meaning." *Rex Real Estate I*, 80 F.4th at 622 (internal citations and quotations omitted). "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features, but courts should give more attention to the dominant features of a mark." *Id*. (internal citations and quotations omitted). "Even if two marks are distinguishable, [courts] ask whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Firebirds*, 397 F. Supp at 863 (internal citations and quotations omitted). "Courts also consider the context in which the marks appear, as well as the color schemes and design elements of the marks." *Id*. (internal citations and quotations

omitted). Based on the photographs provided, the undersigned finds that there is a high degree of mark similarity between GS's marks and the marks affixed to the counterfeit products. See ECF No. 18 at 10, 13.  This factor weighs in favor of GS.

Third, courts consider product similarity. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Rex Real Estate I*, 80 F.4th 607. Here, the hourglass-shaped device decorated to look like two pineapples that is available on Plaintiff's website strikingly resembles a product purchased in defendant's store. ECF No. 18 at 10, 11, 13. This factor weighs in favor of GS.



Exhibit D – Picture from the Plaintiff's website showing glass globes



The Defendant's Use of the Plaintiff's Mark Exhibit B

Exhibit J

The undersigned also notes that although the Expert Report of Frank McBride ("McBride Report"), ECF No. 18-5, stated that the legitimate products and the counterfeit products Mr. McBride examined are nearly identical (*Id*. at 2), the report does not demonstrate that the counterfeit products Mr. McBride examined came from Defendants' store. Instead, Mr. McBride attests only that he examined "a counterfeit product provided to me by The Tictin Law Group." *Id*. at 2. Moreover, the pineapple/hourglass-shaped products from Defendants' store depicted above look quite different from the counterfeit products Mr. McBride examined for his report. Specifically, as demonstrated below, the product examined by Mr. McBride bears no resemblance to a pineapple. ECF No. 18-5 at 11.

Devices



Fourth, courts consider outlet and purchaser identity. "The greater the overlap between the outlets for, and consumers of, the services, the greater the potential for confusion." *Firebirds*, 397 F. Supp. 3d at 865. GS's arguments on this point are not overly persuasive. It argues that its outlets and those of Defendants overlap to the extent that they both sell through brick-and-mortar stores. ECF No. 18 at 16. GS also alleges overlap between its and Defendants' consumer base: "[GS] targets consumers including and outside the scope of Defendants' store." *Id*. The Folkerts Affidavit includes a few general statements, such as, "GS has built a reputation within the industry throughout the United States" and "the Stündenglass Trademarks and GS in general have become famous." ECF No. 13-2 at 2. The Complaint also notes that "Stündenglass branded products reach a vast array of consumers throughout the country." ECF No. 1 at 4. However, GS does not offer evidence of its customer base, such as marketing or sales reports. Therefore, this factor is neutral.

Fifth, courts consider advertising media identity. "For this factor, [courts] look to the similarity between the parties' advertising campaigns. The greater the similarity in the campaigns, the greater the likelihood of confusion." *Rex Real Estate I*, 80 F.4th at 623. According to GS, "Defendants offered for sale a counterfeit in their store but do not advertise that they sell

Stündenglass products anywhere else that [GS] can readily identify." ECF No. 18 at 16. By contrast, "[GS] actively markets its products by offering them for sale online and attending conventions that retailers and wholesalers attend." *Id*. Therefore, since Defendants do not appear to advertise counterfeit products resembling GS's products, this factor is neutral.

Sixth, courts consider the defendant's intent to confuse. "Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion, but if a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of likelihood of confusion." *Firebirds*, 397 F. Supp. 3d at 866. GS argues that "there is simply no other reasonably considered purpose to includ[e] the numerous copies of [its] registered marks all over the box and infuser that Defendants sold than to cause consumers to believe they are purchasing an authentic Stündenglass infuser." ECF No. 18 at 17. Similarly, the Folkerts Affidavit states that Defendants "willfully sold the fake product, for profit." ECF No. 13-2 at 4. The Court agrees. Although the Defendants neither designed nor manufactured the counterfeit goods, they likely knew the goods were counterfeit. Defendants would have to have purchased the G Pen goods at issue from a source other than GS, which would have indicated that the goods may not be authentic. Therefore, this factor weighs in favor of GS.

Seventh, courts consider actual confusion. "Actual confusion need not be proven, but it is the best evidence of a likelihood of confusion." *Rex Real Estate I*, 80 F.4th at 623 (internal citations and quotations omitted). "A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both." *Id*. (internal citations and quotations omitted). GS alleges that its expert has conducted a preliminary study involving showing 51 individuals a photograph of a counterfeit infuser and asking them, "Who do you think is the manufacturer of this waterpipe?" ECF No. 18 at 19. However, GS has not demonstrated that these

"individuals" have ever been customers or potential customers of GS or Defendants. *See Rex Real Estate I*, 80 F. 4th at 627. The rather limited study demonstrates hypothetical confusion among individuals who may have no relationship with the product market rather than demonstrating actual consumer confusion in the marketplace. GS has requested additional time to complete and submit additional expert reports (*see, e.g.* ECF No. 18 at 19, 20), but GS has had ample time to establish this factor if it could. The Court declines this request. Accordingly, this factor is neutral.

Eighth, the Court considers the care exercised by potential customers. "Where items are relatively expensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion … However, a high price tag alone does not negate other [digits of confusion], especially if the goods or marks are similar." *Rex Real Estate I*, 80 F.4th at 627 (internal citations and quotations omitted). GS describes the retail price of the authentic goods at issue as "roughly six hundred dollars, which is an amount that most consumers would generally think twice about spending." ECF No. 18 at 20. Furthermore, GS admits that this price means consumers are "more likely to scrutinize the product before purchasing." *Id*. The rest of GS's argument on this point relies on the McBride Report, but as explained above, GS has not demonstrated that this Report is based on the counterfeit products that were actually purchased at Defendants' store. ECF No. 18 at 21. Therefore, this factor weighs against GS.

"In addition to the digits of confusion, the particular context in which the mark appears must receive special emphasis." *Rex Real Estate I., 80 F.4th at 621 (internal citations and quotations omitted). The Court notes that that the original and counterfeit products both appear in the same smoking and vaping context.

In conclusion, the strength of the mark, mark similarity, product similarity, and intent to confuse weigh in GS's favor, and the other factors are neutral, aside from the care exercised by

consumers, which weighs against GS. However, since "intent to confuse" is alone sufficient to find in GS's favor, and since several other factors are present as well, GS has stated a claim sufficient to meet Rule 8 standards that the digits of confusion have been adequately satisfied. *See Rex Real Estate I*, 80 F. 4th at 627-28. Accordingly, Judge O'Connor should **GRANT** Plaintiff's Motion for Default Final Judgment Against Both Defendants (ECF No. 13).

### C. GS is entitled to statutory damages, costs, injunctive relief, and destruction of counterfeit items.

#### 1. Statutory damages

GS has requested statutory damages of $50,000 per infringing mark for a total of $150,000. ECF No. 13 at 11. Per 15 U.S.C. § 1117(c)(1), where there is a counterfeit mark, the Court is authorized to award "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." Far higher damages are allowable in cases of willful use of the counterfeit mark. 15 U.S.C. § 1117(c)(2). The Fifth Circuit explains that "the purpose of section 1117 is to take all the economic incentive out of trademark infringement." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 340 (5th Cir. 2008) (internal citations and quotations omitted). "Courts enjoy wide discretion in determining damages" under the Lanham Act. *McCune v. Zhongyiqun*, No. 4:22-cv-00604-O, 2023 WL 2912483, at *5 (N.D. Tex., Apr. 12, 2023) (O'Connor, J.).

The undersigned finds that an award of $15,000 in statutory damages is adequate in this instance due to the number of marks infringed, the profits likely made, and the similar awards in other cases. First, Defendants have infringed upon three marks (Nos. 6,174,291, 6,174,292, and 6,633,884), and $5,000 per mark is well within the acceptable range of statutory damages. U.S.C. § 1117(c)(1). No. 6,174,292 is a design mark for the Oblong S Mark, and as for the other marks, GS has explained that although Nos. 6,174,291 and 6,633,884 both protect the same word,

"Stündenglass," they apply to different classes of products. ECF No. 18 at 12-13. However, GS explains that the device that GS's investigator purchased at Defendants' store falls into all relevant classes of products because, in essence, not only can it be used for inhaling smoke, but it can also be used for infusing smoke into food and beverages. *Id*. "In this way, the single product sold by the Defendants has violated both character marks owned by the Plaintiff [since Defendants have] affixed the Plaintiff's mark[s] to a good that violates multiple classes of products recognized by the United States Patent and Trademark Office as separate and registrable." *Id*. at 13.

Second, this amount also takes account of the high price of the counterfeit device ($541.24) and thus, the possibility that Defendants have made substantial profits from the sale of these counterfeit devices. In a similar case, *GS Holistic v. Kenny Gee's* (4:23-cv-00628-O) the undersigned recommended statutory damages of only $5,000, but in that case, the counterfeit device at issue was purchased for less than $20. *See also GS Holistic, LLC v. NWIN LLC*, No. C23-0397 JLR, 2023 WL 7496539, at *7 (W.D. Wash. Nov. 13, 2023) (awarding $2,000 in statutory damages in a case similar to the *Kenny Gee's* case). Conversely, the higher price of the item at issue here may indicate that Defendants sold fewer such items than the defendants did in *Kenny Gee's*, so statutory damages exceeding $15,000 may be excessive.

Furthermore, this amount of statutory damages is within the range of damages that other courts have awarded to GS involving the Stündenglass mark. *See GS Holistic, LLC v. Xtreme Smoke, LLC*, No. 23-cv-897-pp, 2023 WL 8283852 at *2-5 (E.D. Wis. Nov. 30, 2023) (awarding $20,000 in statutory damages for a violation of the same three marks at issue and noting the wide range of statutory damages that courts have awarded in similar cases).

### 2.    Costs

GS has requested "costs in the total amount of $1,388.24 consisting of the filing fee ($402.00), the process server fee ($380.00), and [GS's] investigation fees ($606.24)." ECF No. 13 at 12. GS has not cited any authority in the Lanham Act or elsewhere authorizing its recovery of "investigation fees." Recovery of these fees is not available. *NWIN LLC*, 2023 WL 7496539 at *6. Pursuant to 15 U.S.C. § 1117(a), the undersigned recommends that Judge O'Connor award GS the filing fee and the process server fee for a total of $782.00.

### 3.    Injunctive relief

GS requests injunctive relief under 15 U.S.C. § 1116. ECF No. 13 at 12. "The Lanham Act affords courts the power to grant injunctions, 'according to the principles of equity and upon such terms as the court may deem reasonable.'" *Liberty Burger*, 2023 WL at *6 (quoting 15 U.S.C. § 1116(a)). A party seeking a permanent injunction must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Liberty Burger*, 2023 WL at *6 (quoting *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 626-27 (5th Cir. 2013)).

GS has satisfied the elements necessary for issuance of a permanent injunction. First, "[i]n a dispute over trademark infringement and unfair competition, when a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm." *Id.* (internal citations and quotations omitted). As GS has demonstrated a likelihood of confusion, it also has also shown immediate and irreparable harm.

23

Second, "[b]ecause the harm lies in damage to the trademark owner's reputation and inability to control the quality of services or products by the unauthorized user, the harm is difficult to pinpoint as compensable damages." *Id.* (internal citations and quotations omitted). Accordingly, GS has shown that damages alone are an inadequate remedy for Defendants' actions.

Third, "[w]hen balancing the harms to the plaintiff and defendant, courts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants." *Id.* (internal citations and quotations omitted). That is the case here: any harm Defendants suffer from being forced to stop selling counterfeit GS lookalikes is likely minimal when compared to the harm suffered by GS. *See* ECF No. 13-3.

"Lastly, courts are inclined to grant injunctive relief as within the public's interest—in such disputes over trademark and unfair competition—because the Lanham Act is intended to protect the ability of consumers to distinguish among competing producers." *Liberty Burger*, 2023 WL at *6 (internal citations and quotations omitted). As Defendants have hampered consumers' ability to distinguish between legitimate and counterfeit Stündenglass products, injunctive relief is in the public interest. Therefore, Judge O'Connor should grant an injunction modeled after the injunction proposed by GS (ECF No. 13 at 12).

GS has requested destruction of infringing products under 15 U.S.C. § 1118. As such relief is statutorily warranted, the undersigned recommends that Judge O'Connor issue an order requiring the Defendants, at their cost, to deliver to GS for destruction all products, accessories, labels, signs, prints, packages, wrappers, receptacles, advertisements, and other items in their possession, custody or control bearing any of the four trademarks at issue in this suit, but not including any legitimate products, accessories, labels, signs, prints, packages, wrappers, receptables, advertisements, and other items GS designed or produced. *See* ECF No. 13 at 12-13.

## IV.    CONCLUSION

Default judgment is procedurally warranted, and GS has met the Rule 8 standards on the merits of its Lanham Act claims. Specifically, GS has shown that the trademarks at issue are protectable, that there is a likelihood of confusion, and that there was an intent to confuse. GS has met the appropriate legal standards for costs, statutory damages, and injunctive relief. For these reasons, the undersigned **RECOMMENDS** that Judge O'Connor **GRANT in Part** Plaintiff's Motion for Default Final Judgment Against Both Defendants (ECF No. 13) and award $15,000 in statutory damages, $782.00 in costs, and injunctive relief as stated above.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). To be specific, an objection must identify the particular finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

SIGNED on February 14, 2024.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE

25